BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**JENNIFER J. MARTIN, OSB #842851**
Assistant United States Attorney
jennifer.martin@usdoj.gov
1000 S.W. Third Ave., Suite 600
Portland, OR   97204-2902
Telephone:  (503) 727-1000
Facsimile:  (503) 717-1117
Attorneys for United States of America

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:14-CR-00110-01-SI |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| CHARLES DOUGLAS MIGUEL, | Sentencing Hearing: |
| Defendant. | January 11, 2016, 2:00 p.m. |

The United States of America, by Billy J. Williams, United States Attorney for the District of Oregon, through Jennifer J. Martin, Assistant United States Attorney, submits the following sentencing memorandum for the Court's consideration.

I.      **JOINT SENTENCING RECOMMENDATION**

For the reasons set forth below, the parties jointly recommend that the Court impose a sentence of 120 months' imprisonment on the three counts of conviction, a five year term of supervised release on Counts 2 and 3, three years of concurrent supervised release on Count 5, and a $300 fee assessment.  The parties agree that this sentence properly addresses the nature and seriousness of the relevant conduct in this offense, provides just punishment, affords adequate

deterrence and protects the public from further crimes of this defendant. The Probation Officer agrees with the recommendation.

## II.     PRESENTENCE REPORT

The United States Probation Office (USPO) completed a Presentence Report (PSR). The government believes the Probation Office accurately set forth the factual summary of the offense, criminal history point total and guideline calculation in the PSR ¶ ¶ 17-45, 51-71.

## III.    SUMMARY OF RELEVANT FACTS

### A.     A.L. and D.H. are Victimized by Defendant Miguel in 2012

A.L. and D.H. met Caldwell and Dixon while the four were at an Oregon Youth Authority facility. A few years later, when A.L. and D.H. ran away from home in December 2011, they reconnected with Caldwell. They joined her in Portland in January 2012, and engaged in prostitution activities with Caldwell for a short period of time in January 2012. A.L. and D.H. then engaged in prostitution activities with a pimp in the Portland area for a short time. After experiencing conflicts with the pimp, A.L. and D.H. communicated with Dixon, who enlisted them to engage in prostitution for defendant Miguel. Dixon was approximately seven months pregnant with defendant Miguel's child in January 2012. Dixon posted online prostitution advertisements for the two victims in Salem, Oregon. Shortly thereafter, she introduced them to her pimp, defendant Miguel.

On January 23, 2012, defendant Miguel posted online prostitution advertisements for A.L. and D.H., and they engaged in commercial sex acts for his benefit in Eugene. On January 24, 2012, he transported the two victims from Oregon to California for the purpose of further exploiting them in prostitution.

While they were in California, Miguel "tested" A.L.'s loyalty and obedience. The "test" involved sending text messages to A.L.'s cellphone pretending to be another pimp recruiting her services. When A.L. responded to the call, defendant Miguel beat her for being disloyal and failing the "test."

On January 30, 2012, defendant flew A.L. and D.H. to the east coast where he had them engaged in commercial sex acts for his benefit in Virginia, New Jersey and Maryland. Dixon assisted in setting up customers for commercial sex activities from her home in Las Vegas, Nevada where she was preparing to give birth to defendant Miguel's child. While on the east coast, A.L. once "burned" a sex trafficking customer's (john's) call by not answering it. Defendant Miguel responded to this violation of his rules by physically assaulting her. In interviews with law enforcement officers, A.L. and D.H. discussed defendant Miguel's physically assaulting A.L. and threatening to harm both A.L. and D.H.

Contemporaneous photographs of bruises on A.L.'s face sent by email to a relative further corroborate defendant's assault. D.H. reported that defendant Miguel did not beat D.H., because she followed all of his rules. D.H. reported that on one occasion when A.L. and D.H. had a dispute; Miguel picked D.H. up and dropped her on her head, but D.H. did not consider that to be a beating. D.H. said that on the same occasion, Miguel physically assaulted A.L.

On February 18, 2012, A.L. and D.H. were arrested for Prostitution by the Rockville, Maryland Police Department Street Crimes Unit at the Chase Suites Inn. When the officers went to the rooms rented by defendant Miguel, they were greeted by A.L. and D.H. The officers noticed, in plain view, numerous new and used condoms, wet wipes, and a piece of paper with

"eroticreview.com" written on it.  Eroticreview.com is a website where prostitutes are rated by customers.

D.H. told Rockville police officers that they had been at the hotel for four days and had made about $6,000 by engaging in prostitution.  Rockville Police officers seized two cell phones from A.L. and D.H., because the cell phones were being used for Backpage.com ads and customer calls relating to prostitution activities.

The Rockville Police Department Street Crimes Unit also arrested a sex trafficking customer or "john" who had paid for sexual services from A.L. and D.H.  The customer gave a written statement and claimed that he had responded to a Backpage.com ad by calling the phone number listed in the ad.  The customer stated he paid $400 to have sex with both victims.

On February 17, 2012, A.L. posted two photographs to her Facebook account.  The photos posted "near Rockville, MD".  The first photo is of a man's lap covered with nine (9) stacks of banded currency.  The man is wearing a belt with a jewel-encrusted crown belt buckle.

On February 26, 2012, A.L. posted a picture of her face with a black eye on her Facebook account.  The caption on the photo said, "Black eye but rockin it."  According to A.L. and D.H., A.L. received this beating from defendant Miguel for ignoring a customer's call.

### B.     A.L. and D.H. Leave Defendant Miguel

A.L. tried to leave defendant Miguel, but was prevented from doing so by physical violence and defendant Miguel's retention of her identification.  She ultimately escaped defendant Miguel by leaving with another pimp.  D.H. remained with defendant Miguel and eventually defendant trusted her to travel on her own.  She escaped from defendant while traveling alone to Washington State.

A.L.'s mother later told federal agents she spoke with A.L. by phone while A.L. was being trafficking by Miguel. A.L. repeatedly told her mother that she wanted to leave and was not able to do so. A.L.'s mother did not understand why A.L. felt she could not leave the situation until A.L. sent her photographs of her face after she was beaten by Miguel. A.L.'s mother then understood that defendant Miguel would not allow her daughter to leave. Still, she and A.L. made an effort to persuade Miguel to allow A.L. to come home for an uncle's funeral, but he refused to allow A.L. to do so. A.L.'s mother learned that defendant Miguel told A.L. that she could not leave to attend the funeral.

In May of 2012, A.L. was arrested near the Mexican border with another pimp. She agreed to speak with the agents and gave them a fuller account of the events discussed above.

Using the information from A.L., agents located D.H. who corroborated much of the information from A.L. about their travels with defendant Miguel around the country and of their exploitation in prostitution. Agents gathered additional evidence corroborating the victims' accounts, including flight records, hotel receipts, phone toll records, Backpage.com and other prostitution website postings, police reports, Facebook posts, prepaid debit card records, car rental records, Amtrak records, and witness statements.

### C.    Initial Charges

On March 11, 2014, a federal grand jury returned an indictment charging defendant Miguel and Dixon with a sex trafficking conspiracy involving A.L. and D.H.; charging Miguel with two counts of Mann Act violations for transporting A.L. and D.H. across state lines for prostitution, and charging Caldwell with one count of violating the Mann Act.

///

On March 25, 2014, agents served a search warrant at defendant Miguel's residence in Nevada. Although defendant was not present, they found additional evidence of sex trafficking, and learned that he was in California with an 18 year old victim. A relative at the residence told agents that defendant Miguel was very open about the fact that he was a pimp.

### D.    First Act of Witness Intimidation

On April 29, 2014, the U.S. Marshals Service arrested co-defendant Dixon in Las Vegas Nevada. Once co-defendant Dixon learned that defendant Miguel was named as a defendant in the indictment, she used third parties to warn him about the warrant.

Beginning in late April 2014, defendant Miguel contacted AV3, who is D.H.'s mother. He attempted to intimidate or corruptly persuade AV3's daughter, D.H., to write or sign a letter recanting statements A.L. and D.H. made to law enforcement about defendant Miguel's actions in coercing A.L. and D.H. to engage in commercial sex acts. Defendant acted with the intent to influence, delay, or prevent D.H.'s testimony in an official proceeding relating to the commission of a federal offense, to-wit: Conspiracy to Commit Sex Trafficking, in violation of Title 18, United States Code, Section 1591, in the case known at that time as *U.S. v. Karisah Jane Dixon*, 3:14-CR-00110-02-SI[1].

Between May 2, 2014 and May 5, 2014, defendant Miguel used his telephone to contact D.H.'s telephone on at least nine occasions. On each of these nine occasions, defendant Miguel blocked his own telephone number from registering on D.H.'s telephone by dialing *67 before dialing D.H.'s telephone number. In conversations with D.H., defendant Miguel intimidated and

---

1  At the time, defendant Miguel had not been arrested and the caption of the indictment referencing defendant Miguel was still under seal.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                                                 **PAGE 6**

corruptly persuaded her, leading D.H. to believe that she and her family would be harmed if D.H. did not write or sign the letter recanting the statements. D.H. fled from the area, in part due to her fear of defendant Miguel.

### E. Defendant Miguel Concealed Himself from Arrest after Learning of Federal Indictment

On May 7, 2014, co-defendant Dixon was released to Pretrial Services supervision with the condition that she have only one cell phone and she not have any contact with defendant Miguel or the two victims. Immediately after her release, co-defendant Dixon obtained a second cell phone to contact defendant Miguel and to conceal her communications with him.

Co-defendant Dixon repeatedly tried to obtain permission from a third party to allow defendant Miguel to stay at the third party's residence in order to avoid detection and arrest. The third party would not agree to allow him to stay at the residence. Nevertheless, one day when the third party returned, she found defendant Miguel making plans with co-defendant Dixon to engage in commercial sex.

Eventually, a relative of co-defendant Dixon rented an apartment in her own name to allow defendant Miguel to avoid detection.

### F. Second Act of Witness Intimidation

Between July 15, 2014 and July 21, 2014, defendant Miguel contacted AV3 by telephone. He was initially under the impression that D.H. was using the telephone. Even after learning that it was AV3 rather than D.H., he attempted to intimidate AV3 in an attempt to prevent D.H. from testifying by threatening to harm AV3 and D.H.'s child. AV3 contacted the police and the federal case agent about the telephone call.

///

### G. Defendant Miguel's Arrest

On July 29, 2014, United States Marshal's Service Deputies found and arrested defendant Miguel.

### H. Superseding Indictment and Change of Plea

On May 13, 2015, the same federal grand jury returned a superseding indictment additionally charging defendant Miguel and Dixon with one count of witness tampering and separately charging defendant Miguel with a second count of witness tampering involving a third adult victim (AV3).

On July 23, 2015, defendant Miguel pled guilty to Counts 2 (Mann Act), 3 (Mann Act) and 5 (Witness Intimidation) of the six count Superseding Indictment.

## IV.   SENTENCING CONSIDERATIONS

While not bound by the Sentencing Guidelines, district courts must consult the Guidelines and take them into account when sentencing. *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738, 767 (2005). The sentencing guidelines are advisory and one of the statutory factors this Court must consider when imposing a sentence. See 18 U.S.C. §3553(a)(4); *United States v. Rita,* 551 U.S. 338, 347-48 (2007). They serve as "the starting point and the initial benchmark" in every sentencing proceeding, *Gall v. United States*, 552 U.S. 38, 49 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 350. The guidelines and the procedural rules of sentencing serve as the "lodestone" for the sentencing court, imposing a series of requirements that "cabin" or anchor the exercise of a sentencing court's discretion. *Peugh v. United States*, 133 S.Ct. 2072, 2084 (2013).

///

While advisory, the Supreme Court has observed that, "[c]ommon sense indicates that in general, this system will steer district courts to more within-guidelines sentences."  *Id.*

The statutory factors the sentencing court must consider include the defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant.  18 U.S.C. §§ 3553(a)(1)-(2).  The factors include "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), and, where applicable, the need to provide restitution to any victims of the offense.  18 U.S.C. §3553(a)(7); *see also Rita*, 551 U.S. at 347-48 (enumerating the statutory sentencing factors); *Gall,* 552 U.S. at 50, n.6 (same).

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008), the Ninth Circuit, sitting en banc, summarized the procedures a sentencing court must follow.  The court must first correctly determine the applicable guideline range.  *Id*. at 991.  The court must also allow the parties to "argue for a sentence they believe is appropriate," and must "consider the § 3553(a) factors to decide if they support the sentence suggested by the parties."  *Id*.  The court may not presume the guidelines are reasonable, and should not give them any more or any less weight than any other factor.  *Id.*  The court "must make an individualized determination based on the facts," and must explain its choice of sentence "sufficiently to permit meaningful appellate review." *Id*. at 991-92.

A sentencing court "may accept any undisputed portion of the presentence report as a finding of fact," but that the court "must – for any disputed portion of the presentence report or other controverted matter – rule on the dispute or determine that a ruling is unnecessary either

because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed.R.Crim.P. 32(i)(3)(A)-(B).

V.     **VICTIM IMPACT AND CONSIDERATIONS**

The court should consider the impact of the offenses on the victims in this case; sex trafficking targets vulnerable victims who are often traumatized by their exploitation. Defendant Miguel's use of force and intimidation is corroborated by witness statements, photographs and telephone records. Although the victims have not submitted victim impact statements describing their subjective experiences, the court has evidence that these offenses have been traumatic for the victims.

The government sent restitution paperwork to the victims, but at this time, there is no documented restitution request. The victims are aware of the sentencing date and time and that they may submit a victim impact statement. The government does not anticipate providing the court with a victim impact statement before the sentencing hearing. If one of the victims does submit a victim impact statement or request for restitution, the government will provide it to the court and to defense counsel. If one of the victims decides before the hearing that she wishes to make a statement, the government will advise the court and defense counsel accordingly.

VI.    **GUIDELINES CALCULATION AND SENTENCING RECOMMENDATION**

The government believes the sentencing calculations in the Presentence Report are correct. They differ slightly from the sentencing calculations in the plea agreement, which inadvertently failed to include the application of USSG 2X3.1(a)(1), and incorrectly calculate a total offense category of 28 instead of 27. Although the government believes the guideline sentencing calculations in the PSR are correct, and that the correct guideline range under Total Offense Level

27, CH I is 70-87 months, the extended and varied criminal conduct in this case warrants a more severe sentence. The parties and the probation officer agree that an upward variance to a custodial sentence of 120 months is warranted in this case.

### A. Requested Upward Variance to 120 Months Under 18 U.S.C. § 3553

The parties' jointly recommended sentence of 120 months is warranted by the defendant's lengthy and serious criminal conduct. The 120 month sentence recommendation is the equivalent of a mid-guideline range for an offense under 18 U.S.C. § 1591 (without considering the 15 year statutory mandatory minimum). The parties used the range as a guidepost, and also used charge consideration in allowing defendant Miguel to plead to two Mann Act violations and a Witness Tampering violation in recognition of his decision to enter a change of plea before filing motions, his early acceptance of responsibility, and in order to spare the three victims in this case from having to testify at trial or sentencing.

The charge consideration in the plea agreement also provides defendant the possibility that he may not be subject to the requirements of the federal Sexual Offender Registration Notification Act (SORNA). However, defendant understands that this is not a guarantee, and also understands that he may be subject to sex offender registration requirements under state law, depending upon which state defendant chooses to reside. Finally, the charge consideration in the plea agreement includes the dismissal of the trafficking count that would have required the court to impose a 15 year mandatory minimum sentence if defendant were convicted of the offense.

The proposed increase in the custodial sentence to 120 months balances these accommodations with the need to punish serious criminal conduct and to hold defendant accountable for his conduct in trafficking young women, traumatizing them by using force to

coerce their activities, defrauding them of money over a period of time, and attempting to intimidate witnesses. His conduct is serious and it merits a significant sentence. Defendant's statement to the Probation Officer that he is considering opening a juice bar lounge following his release from custody provides additional support for a significant custodial sentence.

The proposed prison sentence will protect the public from further crimes of the defendant, reflect the seriousness of the offense, promote respect for the law, deter others from recruiting young women to engage in commercial sex acts, intimidating witnesses, and will provide just punishment for the defendant, while also satisfying the requirement of 18 U.S.C. § 3553(a), as a "sentence sufficient, but not greater than necessary" to meet the purposes of § 3553(a)(2).

Accordingly, the government urges the court to accept the parties' plea agreement and impose a 120 month prison sentence, to be followed by a five year term of supervised release on Counts 2 and 3, and a concurrent three year term of supervised release on Count 5. Defendant Miguel should be ordered to pay the $300 statutory fee assessment.

### B.    Forfeiture

Under the terms of the plea agreement, defendant knowingly and voluntarily forfeited all right, title, and interest in a number of assets including one Breitling men's diamond studded watch valued at $5,500; one Acer laptop; $2,100 cash (converted to cashier's check #*****788); $3,500 (converted to cashier's check #******099); one iPod and 3 cell phones seized from defendant Miguel's residence, which defendant admits constitute the proceeds of defendant's criminal activity; or were used to facilitate defendant's criminal activity; or were involved in defendant's money laundering activity. The defendant has complied with the forfeiture agreement between the parties. Some of the assets have been administratively forfeited, and defendant Miguel has

signed or agreed to sign abandonment forms for the remaining items, including the cell phones and the computer.

## VII. MOTION TO DISMISS REMAINING COUNTS

Consistent with the terms of the plea agreement, the government will move to dismiss the remaining counts against defendant Miguel:  Count 1, Sex Trafficking Conspiracy in violation of 18 USC 1591(a)(1), (b)(1), 1594(a),(c); Count 4, Mann Act in violation of 18 USC 2421; and Count 6, Tampering with a Victim in violation of 18 USC 1512 (b)(1) at the conclusion of the sentencing hearing.

## VIII. CONCLUSION AND RECOMMENDATION

The 120 month custodial sentence recommend by the parties and by the Probation Officer in this case reflects the seriousness of the offense and in so doing, provides general deterrence for those contemplating similar recruitment and exploitation of vulnerable victims.   For the reasons set forth above, the government urges the Court to follow the terms of the plea agreement and impose a sentence of 120 months' imprisonment, followed by five years of supervised release on Counts 2 and 3, three years of concurrent supervised release on Count 5, and a fee assessment of $300.

Dated this 6th day of January 2016.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

*/s/ Jennifer J. Martin*
**JENNIFER J. MARTIN, OSB #842851**
Assistant United States Attorney