BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**JENNIFER J. MARTIN, OSB #842851**
Assistant United States Attorney
jennifer.martin@usdoj.gov
1000 S.W. Third Ave., Suite 600
Portland, OR   97204-2902
Telephone:   (503) 727-1000
Facsimile:   (503) 717-1117
Attorneys for United States of America

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:14-CR-00110-02-SI |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| **KARISAH JANE DIXON,** | |
| Defendant. | Sentencing Hearing: February 22, 2016, 10:30 a.m. |

The United States of America, by Billy J. Williams, United States Attorney for the District of Oregon, through Jennifer J. Martin, Assistant United States Attorney, submits the following sentencing memorandum for the Court's consideration.

### I.     GOVERNMENT'S SENTENCING RECOMMENDATION

For the reasons set forth below, the government recommends that the Court impose a sentence of 21 months' imprisonment on Count 1 of the Superseding Information, charging defendant Dixon with Harboring a Fugitive in violation of Title 18, United States Code, Section 1071.

This recommended sentence is slightly adjusted from the recommendation in the plea agreement. It properly addresses the nature and seriousness of the relevant conduct in this offense, provides just punishment, affords adequate deterrence and protects the public from further crimes of this defendant.

The government is aware that defense counsel will present information to the court about the defendant's performance while on pretrial release after July 2014, and that the court will also consider information about the defendant's performance on the CAPS program. The government does not dispute that defendant Dixon has made significant progress over the past 18 months, however, the underlying conduct and the risk posed to the victims is significant as well.

## II.     PRESENTENCE REPORT

The United States Probation Office (USPO) completed a Presentence Report (PSR). The government believes the Probation Office accurately set forth the factual summary of the offense, criminal history point total and guideline calculation in the PSR ¶¶ 14-29, 34-43, 58-62.

## III.    SUMMARY OF RELEVANT FACTS

Although defendant Dixon's charge of conviction is Harboring a Fugitive, the government provides the larger background to the defendant's concealment of codefendant Miguel to put her offense, and the terms of the plea agreement into context. The Presentence Report correctly recites the conduct in the Offense Conduct Section (¶¶ 14-29) and the Offense Behavior Not Part of Relevant Conduct (¶¶ 44-57).

A.L. and D.H. met defendant Dixon and codefendant Caldwell while the four were at an Oregon Youth Authority facility. A few years later, when A.L. and D.H. ran away from home in December 2011, they reconnected with codefendant Caldwell. They joined her in Portland in

January 2012, and engaged in prostitution activities with Caldwell for a short period of time in January 2012.   A.L. and D.H. then engaged in prostitution activities with a pimp in the Portland area for a short time.   After experiencing conflicts with the pimp, A.L. and D.H. communicated with defendant Dixon, who enlisted them to engage in prostitution for defendant Miguel.  Defendant Dixon was approximately seven months pregnant with defendant Miguel's child in January 2012.   A.L and D.H. told officers that defendant Dixon posted online prostitution advertisements for the two victims in Salem, Oregon.   Shortly thereafter, she introduced them to her pimp, defendant Miguel.

On January 23, 2012, defendant Miguel posted online prostitution advertisements for A.L. and D.H., and they engaged in commercial sex acts for his benefit in Eugene.   On January 24, 2012, he transported the two victims from Oregon to California for the purpose of further exploiting them in prostitution.

On January 30, 2012, codefendant Miguel flew A.L. and D.H. to the east coast where he had them engaged in commercial sex acts for his benefit in Virginia, New Jersey and Maryland.  A.L. and D. H. said that defendant Dixon assisted in setting up customers for commercial sex activities from her home in Las Vegas, Nevada where she was preparing to give birth to defendant Miguel's child.   Defendant Dixon's continuing involvement in the trafficking is documented by her telephone tolls in the following event.

On February 18, 2012, A.L. and D.H. were arrested for Prostitution by the Rockville, Maryland Police Department Street Crimes Unit at the Chase Suites Inn.   When the officers went to the rooms rented by codefendant Miguel, they were greeted by A.L. and D.H.   The officers noticed, in plain view, numerous new and used condoms, wet wipes, and a piece of paper with

"eroticreview.com" written on it. Eroticreview.com is a website where prostitutes are rated by customers. D.H. told Rockville police officers that they had been at the hotel for four days and had made about $6,000 by engaging in prostitution. Rockville Police officers seized two cell phones from A.L. and D.H., because the cell phones were being used for Backpage.com ads and customer calls relating to prostitution activities.

Contemporaneous phone toll records show that defendant Dixon was in steady communication with the two victims and codefendant Miguel. The volume of the telephonic contact supports AL and DH's statement that defendant Dixon was a participant in the trafficking and was involved in scheduling dates with johns for the two victims. The redacted chart below shows A.L. on the left hand side, and D.H. on the right hand side, with defendant Dixon on the bottom middle portions, and codefendant Miguel in the middle of the graph. The arrowed lines show the number of calls between these four individuals for the three day period starting the day before the arrests through the day after the arrests.



**GOVERNMENT'S SENTENCING MEMORANDUM**                                            **PAGE 4**

A.L. and D. H. were both eventually able to flee from codefendant Miguel.

Defendant Dixon was arrested in Nevada on April 9, 2014. She appeared initially in Las Vegas, Nevada, and was transported in custody to the District of Oregon. While in custody in Nevada, defendant Dixon learned that codefendant Miguel had also been indicted and she used third parties to warn him about the arrest warrant.

Defendant Dixon appeared in the District of Oregon on May 7, 2014, and was released on very strict conditions, including specific conditions that she possess only one cellphone, that she have no contact with codefendant Miguel, and that she have no contact with the two victims.

Immediately after her release from custody in May, 2014 in the District of Oregon, defendant Dixon obtained a second cellphone to facilitate and conceal her continuing communication with codefendant Miguel. She was able to hide her contact with the codefendant because she maintained one cellphone that she showed to the Pretrial Services Officer, and the second cellphone that she used to communicate with defendant Miguel.

At the time of her release in May 2014, neither the court nor the government knew that defendant Dixon had already engaged in witness tampering. Agents later obtained and reviewed jail calls from Las Vegas, Nevada where Dixon was held in custody following her arrest in April. These recorded jail calls revealed that following her arrest, defendant Dixon repeatedly attempted to contact AV2 via third parties in order to make her draft and sign a notarized letter recanting her statements to law enforcement. Defendant Dixon discussed these witness tampering efforts with her new boyfriend, "Cadillac Mike," and her sister, and it is clear from the jail calls that "Cadillac Mike" and Dixon's sister, as well as codefendant Miguel, did in fact reach AV2, and told her to write a notarized letter withdrawing her statements. Codefendant Miguel later pled guilty to a

Witness Tampering charge for this conduct.

With this new information, agents searched for AV1 and AV2 to ensure that they were safe. First, they reached AV3, who confirmed that AV2 had been contacted about writing a letter, and that she had fled from home after receiving threats. After some time, agents located AV2. She confirmed that codefendant Miguel, defendant's then boyfriend "Cadillac Mike," and Dixon's sister, had contacted AV2 about the notarized letter, and that codefendant Miguel had threatened her. Codefendant Miguel told her, "you need to do this letter. If you fuck with mine (his life), I'll fuck with yours." When AV2 told defendant that she had told the truth to law enforcement, defendant said, "you wanna play? Game on." Upon receiving these threats, AV2 immediately fled her home, where she had been living with AV3 and her young child, making it difficult for agents to locate her.

A few days after making contact with AV2, agents received a frantic call from AV3's mother, who lives with AV2's child. She reported a renewed threat from codefendant Miguel.

Following these reports, agents intensified their efforts to locate codefendant Miguel in the District of Oregon. A deputy U.S. Marshal learned that codefendant Miguel was in the Salem, Oregon area, where defendant Dixon and her relative were actively hiding him from law enforcement.

On June 27, 2014, defendant Dixon provided the full names for D.H. and A.L. to codefendant Miguel, knowing that he would use the information to avoid detection and apprehension.

In early July, defendant Dixon repeatedly and unsuccessfully sought permission from a third party to permit defendant Miguel to stay at the third party's residence so that he could avoid

law enforcement.  Again in early July 2014, defendant Dixon concealed codefendant Miguel in the third party's residence without permission in order to conceal him.

Later in July 2014, defendant Dixon's relative rented a residence under her own name for codefendant Miguel in order to conceal his whereabouts.  On July 8, 2014, codefendant Miguel sent Defendant Dixon a text with his address.  Defendant Dixon knew her relative had rented the apartment for him.  During this time frame, defendant Dixon was engaged in acts of prostitution, and she provided the resulting funds to codefendant Miguel.

The U.S. Marshal's Service arrested codefendant Miguel at his Salem apartment on July 29, 2014.  He had been a fugitive for almost five months.

On July 30, 2014, federal Pretrial Services Officers contacted defendant Dixon on a Pretrial Release violation, and found her in possession of the second cellphone she used to contact codefendant Miguel.  Defendant Dixon had not told her Pretrial Service Officer that she had changed her residential address and been in contact with codefendant Miguel.

### IV.    SUPERSEDING INDICTMENT, SUPERSEDING INFORMATION AND CHANGE OF PLEA

On May 13, 2015, defendant Dixon was charged in a Superseding Indictment which added charges of Tampering with a Witness.  On July 24, 2015, under the terms of a plea agreement between the parties, defendant Dixon was arraigned on and pleaded guilty to a Superseding Information charging her with Harboring a Fugitive.

### V.    SENTENCING CONSIDERATIONS

While not bound by the Sentencing Guidelines, district courts must consult the Guidelines and take them into account when sentencing.  *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738, 767 (2005).  The sentencing guidelines are advisory and one of the statutory factors this

Court must consider when imposing a sentence.  See 18 U.S.C. § 3553(a)(4); *United States v. Rita,* 551 U.S. 338, 347-48 (2007).  They serve as "the starting point and the initial benchmark" in every sentencing proceeding, *Gall v. United States*, 552 U.S. 38, 49 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  *Rita*, 551 U.S. at 350.  The guidelines and the procedural rules of sentencing serve as the "lodestone" for the sentencing court, imposing a series of requirements that "cabin" or anchor the exercise of a sentencing court's discretion.  *Peugh v. United States*, 133 S.Ct. 2072, 2084 (2013).

While advisory, the Supreme Court has observed that, "[c]ommon sense indicates that in general, this system will steer district courts to more within-guidelines sentences."  *Id.*

The statutory factors the sentencing court must consider include the defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant.  18 U.S.C. §§ 3553(a)(1)-(2).  The factors include "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), and, where applicable, the need to provide restitution to any victims of the offense.  18 U.S.C. §3553(a)(7); *see also Rita*, 551 U.S. at 347-48 (enumerating the statutory sentencing factors); *Gall,* 552 U.S. at 50, n.6 (same).

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008), the Ninth Circuit, sitting en banc, summarized the procedures a sentencing court must follow.  The court must first correctly determine the applicable guideline range.  *Id*. at 991.  The court must also allow the parties to "argue for a sentence they believe is appropriate," and must "consider the § 3553(a) factors to

decide if they support the sentence suggested by the parties." *Id*. The court may not presume the guidelines are reasonable, and should not give them any more or any less weight than any other factor. *Id*. The court "must make an individualized determination based on the facts," and must explain its choice of sentence "sufficiently to permit meaningful appellate review." *Id*. at 991-92.

A sentencing court "may accept any undisputed portion of the presentence report as a finding of fact," but that the court "must – for any disputed portion of the presentence report or other controverted matter – rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed.R.Crim.P. 32(i)(3)(A)-(B).

## VI. <u>VICTIM IMPACT CONSIDERATIONS</u>

The government understands, but disagrees with the Presentence Report's conclusion that Victim Impact is not applicable in this case. 18 U.S.C. § 3771 defines victims as anyone directly and proximately harmed by such an offense, individuals and legal entities. Defendant Dixon's conduct in conveying the victim's contact information to codefendant Miguel enabled him to harass two of the three victims.

In this case, the underlying facts in the larger case, and the continued harassment of two of the three victims by codefendant Miguel was a serious concern. Defendant Dixon enabled codefendant Miguel by providing the victim's contact information to codefendant Miguel while concealing him from law enforcement officers.

The victims are aware of the sentencing date and time and that they may submit a victim impact statement. The government does not anticipate providing the court with a victim impact statement before the sentencing hearing. If one of the victims does submit a victim impact

statement, the government will provide it to the court and to defense counsel.   If one of the victims decides before the hearing that she wishes to make a statement, the government will advise the court and defense counsel accordingly.

## VII.   GUIDELINES CALCULATION AND SENTENCING RECOMMENDATION

The government believes the sentencing calculations in the Presentence Report are correct.

| | |
|---|---:|
| Base offense level<br>U.S.S.G. § 2X3.1(a)(3)(B) | 20 |
| Obstruction of justice<br>U.S.S.G. § 3C1.1 | +2 |
| Acceptance of responsibility<br>U.S.S.G. § 3E1.1 | -3 |
| | 19 |

The Presentence Report calculated the defendant's criminal history as III, and the resulting sentencing range would be 37-46 months.

Under the terms of the agreement, defendant reserves the right to seek up to the equivalent of four (4) levels downward departure, adjustment or variance from the applicable sentencing guideline range determined by the Court and understands that the government reserves its right to oppose such a request.   The basis for the departure, adjustment or variance must be limited to U.S.S.G. § 3B1.2(b), § 5K2.12, or 18 U.S.C. § 3553 (a)(2)(D).

Based on preliminary discussions with defense counsel, the government believes it will concur in the proposed four level downward departure, adjustment or variance.   If granted, this would result in an advisory sentencing range of 24-30 months.

The government notes that defense counsel will also seek a downward departure based upon the overrepresentation of defendant's criminal history category, U.S.S.G.§ 4A1.3(b)(1). The government does not oppose the departure from criminal history III to criminal history category II under the specific facts in this case concerning defendant Dixon's juvenile offense committed at age 15.   If granted, this would result in an advisory sentencing range of 21-27 months.

Finally, government notes that the charge consideration in the plea agreement includes the dismissal of the trafficking count in the Indictment and Superseding Indictment that would have required the court to impose a 15 year mandatory minimum sentence if defendant were convicted of the offense.   This is a significant concession.

While the defendant's conduct since July of 2014 has shown improvement, her decisions during the offense put three victims at rick from codefendant Miguel.   The conduct is serious and the sentence should reflect the seriousness of the conduct and the threats to the victims that defendant Dixon enabled.

However, the government recognizes that this Court is also interested in the defendant's performance while on released after the change of plea.   The government understands that United States Magistrate Judge Papak will address the court at the sentencing hearing or will provide a letter for the file in this matter.   The government also understands that the defense intends to present evidence from SARC to assist the Court in understanding the impact of the trauma bond on defendant's decisions and actions.   The government takes no position on the Court's consideration of this additional information, which is not reflected in the plea agreement or the Presentence Report.

**VIII.    MOTION TO DISMISS REMAINING COUNTS**

Consistent with the terms of the plea agreement, the government will move to dismiss the Indictment and the Superseding Indictment at the conclusion of the sentencing hearing.

**IX.    CONCLUSION AND RECOMMENDATION**

The low end of the range sentence recommend by the government and by the Probation Officer in this case reflects the seriousness of the offense and in so doing, provides general deterrence for those contemplating similar recruitment and exploitation of vulnerable victims, harboring fugitives and intimidating witnesses.   It will provide just punishment for the defendant, while also satisfying the requirement of 18 U.S.C. § 3553(a), as a "sentence sufficient, but not greater than necessary" to meet the purposes of § 3553(a)(2).   For the reasons set forth above, and consistent with the terms of the plea agreement, the government recommends the court impose a 21 month custodial sentence, a three year term of supervised release and a $100 fee assessment.

When released, the government recommends the court impose as additional special conditions of supervised release 1) that defendant Dixon have no contact with codefendant Miguel unless approved in advance by her probation officer, and 2) that defendant provide a financial accounting of all sources of income to her probation officer.

Dated this 17th day of February 2016.

    Respectfully submitted,

    BILLY J. WILLIAMS
    United States Attorney


    */s/ Jennifer J. Martin*
    **JENNIFER J. MARTIN, OSB #842851**
    Assistant United States Attorney